SEALED BY ORDER
OF THE COURT



FILED

SEP 2 0 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

SMITH PATTEN
DOW W. PATTEN (SBN: 135931)
888 S. Figueroa St., Suite 2030
Los Angeles, CA 90017
Telephone (415) 402-0084; (213) 488-1300
Facsimile (415) 520-0104

Attorney for Plaintiff-Relator
DIANA JUAN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *Ex rel.* DIANA JUAN, <br><br> Plaintiff, <br><br> v. <br><br> REGENTS OF THE UNIVERSITY OF CALIFORNIA; UNIVERSITY OF CALIFORNIA SAN FRANCISCO; STEPHEN HAUSER;  JOHN ENGSTROM; SAM HAWGOOD;  EILEEN KAHANER; DAVID MORGAN; JANE CZECH; SCOTT ANDY JOSEPHSON; JENNIFER DEARMAN, and DOES 9 through 10, inclusive, <br><br> Defendants. | **Case No.:**  CV 16-4934-DMR <br><br> **FILED IN CAMERA AND UNDER SEAL** <br> **FALSE CLAIMS ACT MEDICARE** <br> **FRAUD** <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732 OF THE FEDERAL FALSE CLAIMS ACT**

The United States of America, by and through *qui tam* relator DIANA JUAN ("Plaintiff-Relator" or "JUAN"), brings this action under 31 U.S.C. § 3729, *et seq.*, as amended ("False

1

Claims Act"), to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States Government ("Government").

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729-3730.

2.      There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

3.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because all the Defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in the Northern District of California.

4.      Venue is proper in this Court pursuant to 31 U.S.C. § 3730(b)(1) because all of the Defendants have at least minimum contacts with the United States, and all the defendants can be found in, reside, or transact or have transacted business in the Northern District of California. Defendants REGENTS OF THE UNIVERSITY OF CALIFORNIA and the UNIVERSITY OF CALIFORNIA SAN FRANCISCO (collectively hereinafter, "Defendants" or "UCSF") do business in this District.

5.      Pursuant to the requirements of 31 U.S.C. § 3730(b), Plaintiff-Relator will provide the Government with a confidential written disclosure statement of material and information regarding the alleged violations.

6.      The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty ranging from a minimum of five thousand five hundred dollars ($5,500) to a

2

maximum of eleven thousand dollars ($11,000) for each such claim, plus three times the amount of the damages sustained by the Government.  The False Claims Act allows any person having information about a false or fraudulent claim against the Government to bring an action for herself and the Government, and to share in any recovery.  The False Claims Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

7.     Under Medicare, physicians, hospitals, and clinics each have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims.

## INTRODUCTION

8.     This is an action for treble damages and penalties for each false claim and each false statement under the False Claims Act.  31 U.S.C. § 3729, *et seq.*; *see also* 42 U.S.C. § 1320a-7k(d)(2); 42 U.S.C. § 1320a-7k(d)(4)(B).

## THE PARTIES

9.     Plaintiff-Relator JUAN was an individual formerly employed by Defendants as Administrative Director, Clinical Operations at UCSF Medical Center, and has witnessed practices at Defendants which result in and constitute false claims under the False Claims Act.

10.     Defendants REGENTS OF THE UNIVERSITY OF CALIFORNIA and UNIVERSITY OF CALIFORNIA SAN FRANCISCO operate in the Northern District of California, and have systems in place at the UNIVERSITY OF CALIFORNIA SAN FRANCISCO which submit claims for services rendered which have not been rendered, or which have not been completed,

knowing that claims for such services would be submitted to Medicare and/or Medicaid for reimbursement, and which constitute false claims under the False Claims Act.

11.     Defendant STEPHEN HAUSER, originally sued as DOE 1, is the Director of Weill Institute of Neurosciences and Chair of Neurology of Defendant UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

12.     Defendant JOHN ENGSTROM, originally sued as DOE 2, is the Director, Neurology Residency Program, and Clinical Chief of Service of Defendant UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

13.     Defendant SAM HAWGOOD, originally sued as DOE 3, is the current Chancellor and former Dean of the Medical School of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

14.     Defendant EILEEN KAHANER, originally sued as DOE 4, is the Clinical Compliance Director of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

15.     Defendant DAVID MORGAN, originally sued as DOE 5, is the Executive Director of of Ambulatory Services at UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

16.     Defendant JANE CZECH originally sued as DOE 6, is the Director of Administration of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

17.     Defendant SCOTT ANDY JOSEPHSON originally sued as DOE 7, is the Professor and Senior Executive Vice Chair of Neurology, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

18.     Defendant JENNIFER DEARMAN originally sued as DOE 8, is the Director of Ambulatory Services, and is responsible for the acts and omissions set forth below constituting the submission of False Claims

19.     Collectively, HAUSER, ENGSTROM, HAWGOOD, KAHANER, MORGAN CZECH, JOSEPHSON, and DEARMAN are referred to herein as the "Individual Defendants".

20.     Plaintiff-Relator is ignorant of the true names and capacities of defendants sued herein as Does 5-10, inclusive, and Plaintiff-Relator therefore sues such defendants by such fictitious names.  Plaintiff-Relator will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff-Relator is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts, and, omissions alleged herein and that Plaintiff-Relator's injuries as alleged herein were proximately caused by such aforementioned defendants.

## OVERVIEW OF MEDICARE BILLING & REIMBURSEMENT

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.  Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

22.     Medicare has two parts relevant to the instant action: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A.

23.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals and skilled nursing facilities (not custodial or long-term care).  Medicare Part A also helps cover hospice care and some home health care.

24.     Under Medicare Part A, the amount paid by Medicare to a hospital for inpatient services is based primarily on the particular diagnosed illness or condition that led to the patient's admission to the hospital, or the patient's illness or condition that is principally treated by the hospital; as such, the correct and appropriate coding of services and identification of patients are a material part of compliance with the requirements of Medicare Part A.

25.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care.  It also covers some other medical services that Part A does not (i.e., physical and occupational therapist services, etc.).  Part B helps pay for covered health services and supplies when they are medically necessary.

26.     Payments from the Medicare Program come from the Medicare Trust Fund, which is funded through payroll deductions in addition to government contributions.  Over the last 50 years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

27.     Medicare is administered by the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS.

28.     To bill Medicare and receive reimbursement for claims for inpatient services, a hospital must file a provider agreement with the Secretary of HSS.  42 U.S.C. § 1395cc.  The provider agreement conditions reimbursement for claims on compliance with the requirements of applicable statutes and regulations.

29.     A large portion of the day-to-day administration and operation of Medicare is managed through private insurers under contract with the federal government and, in particular, CMS.

30.     To assist in the administration of Medicare Part A, CMS contracts with fiscal intermediaries.  *See* 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are

6

responsible for processing and paying claims and cost reports in accordance with rules developed by the Health Care Financing Administration ("HCFA"), now known as CMS.

31.     Under Medicare Part B, the Government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas.  These private insurance companies, or "Medicare Carriers," are responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

32.     The principal function of both fiscal intermediaries and Medicare Carriers is to make and audit payments for Medicare services to assure that federal funds are spent according to law and regulation.

33.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the Medicare Carriers and fiscal intermediaries.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.  *See* 42 § C.F.R. 421.5(b).

34.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary.  Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

35.     Additionally, providers who wish to be eligible to participate in Medicare Part A must periodically submit an application to participate in the program.  The application, which must be signed and/or electronically submitted by an authorized representative of the provider, contains a certification statement: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. […] I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws,

regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

## MEDICARE CERTIFICATION

36.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form, CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claims that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

37.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider claims it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider had been overpaid and must reimburse Medicare.  *See* 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1).

38.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient services during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare Part A program or the amount due to the provider.

39.     Under the rules applicable at all relevant times, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial

representations made by Defendants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. *See* 42 C.F.R. § 413.64(f).

40.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

41.     For all relevant years, the responsible designee for Defendants' Medical Center was required to certify, and did certify, in pertinent part: "to the best of my knowledge and belief, [the hospital cost report] and statement are true, correct, complete, and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

42.     For the entire period at issue, the hospital cost report certification page also included the following sentence: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

43.     Thus, the provider must certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider;

9

and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including Medicare and Medicaid laws and regulations.

44.     For each of the years at issue, UCSF Medical Center submitted cost reports attesting, among other things, to the certification quoted above.

45.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports).

## OVERVIEW OF MEDICAID BILLING & REIMBURSEMENT

46.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.  The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled persons.  Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

47.     Medicaid is a cooperative federal-state public-assistance program, which is administered by the states.  In California, the Medicaid program is called Medi-Cal and is administered by the California Department of Health Care Services ("DHCS"), a department within the California Health and Human Services Agency ("CHHS").

48.     Funding for Medicaid is shared between the Government and those state governments that choose to participate in the program.  Federal support for Medicaid is significant.  For example, the Government provides 50% of the funding for Medi-Cal, while the State of California funds the other half.

49.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), (30)(A).

50.     Like Medicare Part B, Medi-Cal pays providers for services actually rendered, as represented on the claim form, and services that are reasonable and medically necessary.

51.    By becoming a participating provider in the Medi-Cal program, UCSF Medical Center agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

## CONDITIONS OF PARTICIPATION

52.    In order to obtain reimbursement from Medicare or Medi-Cal for inpatient and outpatient diagnostic procedures like magnetic resonance imaging ("MRIs") and electroencephalograms ("EEGs"), a provider must comply with a strict statutory and regulatory scheme administered by DHCS (for Medi-Cal) and CMS (for Medicare).  In order to receive reimbursement from the Government, providers must comply with numerous "Conditions of Participation" that define the procedures and standards of care which must be followed in the course of treatment.

53.    Compliance with the Conditions of Participation is material to the decision by both the Government and the State of California to pay Medicare or Medi-Cal claims, and providers implicitly certify that they have complied with these Conditions of Participation each time they present a claim for goods and services.

54.    Participation in Medi-Cal requires meeting all requirements for participation in Medicare. 42 C.F.R. § 482.1(a)(5).

55.    As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital "must be in compliance with applicable Federal laws related to the health and safety of patients."  42 C.F.R. § 482.11(a).  The hospital must also "assure that personnel are licensed or meet other applicable standards that are required by State or local laws."  42 C.F.R. § 482.11(c).

56.    As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital must have "an effective governing body that is legally responsible for the conduct of the hospital."  42 C.F.R. § 482.12.

11

57.     Additionally, as a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, the "provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment." 42 C.F.R. § 424.5(a)(6).

58.     The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of [*inter alia*, subparagraphs (A), (B), or (G)];
>
> [...]
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $ 10,000, [...] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C), (G).  The False Claims Act thereafter defines the requisite scienter for a violation:

> [T]he terms "knowing" and "knowingly"--
>
> (A) mean that a person, with respect to information--
>
> > (i)  has actual knowledge of the information;
> > (ii)  acts in deliberate ignorance of the truth or falsity of the information; or
> > (iii)  acts in reckless disregard of the truth or falsity of the information; and
>
> (B)  require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1)(A)-(B).  Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 ("ACA") amended the Social Security Act by adding a new provision that addresses what constitutes an "overpayment" under the False Claims Act in the context of a federal health care program.  Under this section, an "overpayment" is defined as "any funds that a person

receives or retains under Title XVIII or XIX [...] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).  In addition, an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(2).

59.     Failure to return any overpayment constitutes a reverse false claim actionable under the False Claims Act.  31 U.S.C. § 3729(a)(1)(G).

## FACTUAL ALLEGATIONS OF FALSE CLAIMS ACT VIOLATIONS

60.     In 2003, JUAN joined the Department of Neurology as the Practice Manager of Neurology Outpatient Practice.  She was responsible for oversight of the efficient organization and operation of the clerical and reception activities of the Neurology Outpatient Practice.  This included managing clerical staff, developing and maintaining clerical procedures, proposing operational policy improvements, and monitoring the following: the patient appointment system and physician clinical schedules, communications systems, database entry, patient reception, and phone systems (including voicemail systems).

61.     Additionally, in collaboration with the Neurology Clinical Services Manager, Director of Administration, and Vice-Chair, JUAN analyzed outpatient practice financial operations and made policy and procedure recommendations.  She also assisted in the monitoring and controlling cost center expenditures, reconciled expenditures to the general ledger, and summarized activity to the Clinical Services Manager.

62.     In 2007, JUAN earned a promotion to the position of Administrator Director, Clinical Operations position for the Neurology Department.  In this position, she managed plans and directed the clinical operations and resources of the Department of Neurology's Inpatient and Outpatient Services.  She was responsible for the inpatient neurology stroke/intensive care unit ("ICU"), epilepsy, and ward-consult services, the Ambulatory Care Center Clinics on the eighth

floor, and the Mt. Zion Headache Clinic. This included all clinical and business operations, as well as financial, human, and other resources for several subspecialities in the Neurology Clinical Practices. JUAN was responsible for the administration of all patient activities, ensuring that the strategic goals were met for the delivery of high-quality, cost-effective health care services in alignment with Medical Center, federal, state, and local laws and regulations.

63.     Between 2007 and 2009, JUAN tasked her staff with investigating and tracking problems with "provider dictations" because there were complaints from referring physicians that they were not receiving them. The staff manually reconciled every list to ensure that there was corresponding documentation. The original hypothesis as to the source of the problem was that the Health Information Management Systems ("HIMS") had operational issues, but JUAN and her staff soon discovered that there was a different issue.

64.     JUAN and her staff identified systemic and long-standing issues in UCSF's Department of Neurology: providers were not generating reports after a patient visit. Various dispositions include: (i) reports not being generated in a timely manner to referring physicians; (ii) patient visits occurring with no reports; and (iii) instances of illegible medical notes. In response, JUAN and her staff reported their findings to departmental leadership, Dr. John Engstrom, M.D. ("Dr. Engstrom") and Dr. Stephen Hauser, M.D. ("Dr. Hauser"), to improve the physician documentation.

65.     These issues have remained ongoing despite their disclosure to the leadership of UCSF's Department of Neurology for many years. There is a significant likelihood that the above-described fraud has been committed prior to 2007, considering that there was no mechanism in place to ensure that proper documentation was synchronized with submissions to Medicare and Medi-Cal. Because this issue is not unique to the Department of Neurology, there is a significant probability that this fraud was also occurring in other clinical departments at UCSF.

14

66.     Prior to 2009, documentation for outpatient patient visits were handwritten on paper charts, dictated into a database called "STOR," some combination of both, or none of the above (and documentation was unsynchronized to the billing of these visits).  Billing staff would receive submitted paper copies of encounter forms and manually enter the information into the "IDX" system created by the IDX Systems Corporation, a healthcare software technology vendor used by UCSF Medical Center for scheduling, billing and collection, etc.

67.     As the Administrative Director of UCSF Clinical Operations, JUAN was responsible for all administrative aspects of the Department of Neurology, including but not limited to internal controls, billing, and staffing.  Beginning in early 2009, after her promotion to this position, JUAN uncovered inconsistencies and inefficiencies in the billing practices within the Department of Neurology.

68.     Specifically, JUAN observed that charges were missing, that UCSF-submitted billings for reimbursement by Medicare and other payers were incorrectly coded based on the documentation, and that UCSF's billings lacked the proper documentation required by Medicare. JUAN immediately informed Dr. Engstrom, the Chief of Clinical Services, and Jane Czech ("Ms. Czech"), the Director of Administration, about these major billing discrepancies.  (*Id.*) The Chair of Neurology, Dr. Hauser, also had known or been made aware of these billing and compliance issues.  Over the next few months, JUAN and her team made a significant financial turnaround for clinical services, working to fix the long-standing billing issues.  (*Id.*)

69.     JUAN proposed that the Department of Neurology create a dedicated billing unit, which Ms. Czech agreed on or around April 28, 2009 to authorize her to implement.

70.     Ms. Czech recognized JUAN for her role in the "[Neurology Department's] financial turnaround" and agreed with JUAN on a new leadership structure that would enable JUAN to

focus on the billing and collections to further enhance and sustain the achievements she and her team had already made.

71.    For example, a snapshot as of November 24, 2009 indicated there were 775 unsigned letters, 286 greater than 14 days.  This statistic, as dismal as it was, represented a drastic improvement of the pre-existing problem prior to the project initiated by JUAN in 2007.

72.    In or about 2009, JUAN, as the new Administrative Director of Clinical Operations, was pulled into the tail end of Medicare settlement discussions with UCSF representatives resulting from a Medicare audit for improper billing practices perpetrated by the Memory and Aging Center within the Department of Neurology.  JUAN assisted that division in securing a pre-submission accuracy score of 95% Pre-Bill Quality Review ("PBQR") with Medicare and other payers.  The Memory and Aging Center was eventually fined approximately one million dollars ($1,000,000.00) by Medicare for misbillings.  As part of that settlement, the Department of Neurology was placed on a PBQR that required 95% compliance prior to the submission of a billing.

73.    UCSF uses five-digit Current Procedural Terminology Codes ("CPTs") to describe and categorize physician-encounters in order to facilitate billing with payors, such as CMS and private insurance companies.  Each billable procedure has an applicable CPT code.

74.    The Evaluation and Management ("E&M") coding process determines which physician-patient encounters become CPTs.  Different E&M codes apply to different types of physician-patient encounters, such as office visits or hospital visits.  Within each type of encounter, the CPT code methodology provides for different levels of care, which CMS reimburses at different rates.  For example, the "99214" code may be used to charge for an office visit with an established patient.  There are five levels of care for this type of encounter.  The "99214" code is often referred to as a "level 4" office visit because the code ends in "4" and also because it is the

fourth "level of care" for that type of visit.  (The code "99215" signifies the fifth and highest level of care.)  Each physician-patient encounter may be viewed as a unique procedure which requires specific documentation.

75.     In light of the substantial fine it incurred for Medicare misbilling, UCSF was clearly on notice that its internal systems were unable to comply with Medicare's certification procedures, at least as early as 2009, and upon information and belief, earlier to that time.

76.     In June 2010, the University of California, Office of the President engaged FTI Consulting ("FTI"), which conducted a probe audit of several clinical departments to determine the accuracy of the line item E&M code selection based upon clinical documentation to support payments received from CMS for Medicare-facility-fee claims for the time period starting on January 1, 2007 and ending December 31, 2009.  The probe audit revealed a very high error rate in over-coding and overbilling greatly exceeding the under-coding and underbilling to both private insurers and Medicare.

77.     As a result of the audit, UCSF's School of Medicine mandated that the Department of Neurology and other clinical departments outsource the E&M process—i.e., reviewing patient admissions and encounters, charts, and notes to apply the correct CPT codes—and discontinue the practice of relying on individual physicians to apply the appropriate CPT codes to their physician-patient encounters.  However, at no time did UCSF or any of its departments implement an industry-standard Quality Assurance policy for the monitoring the external coders.

78.     During this time, JUAN endeavored to ensure that the new process of utilizing external coders was compliant with Medicare coding requirements.  Specifically, JUAN inquired as to what mechanisms would be instituted to validate the coding accuracy.  This issue was raised with Department of Neurology leadership, UCSF's Director of Compliance, and other leadership from the School of Medicine.  JUAN uncovered significant coding inaccuracies with some of the

coding vendors, and as a result, Aviacode, a UCSF vendor, was commissioned to complete an audit in 2011.  One audit of 309 physician notes revealed that 4% were overcoded, with an accuracy rate of 59.2%.  Overcoding occurs when the wrong code is used, resulting in excess billing and revenue either to Medicare or to private insurers and health plans.

79.     Another audit of 294 total documents revealed that 22.9% were overcoded, with an accuracy rate of 41.9%.  JUAN escalated these results to the Department of Neurology's leadership, Ms. Czech and Dr. Engstrom, as well as the Director of Revenue Management, Kevin McLaren ("Mr. McLaren").  Dr. Hauser was also aware of these misbilling issues.  In response, JUAN was chastised by Mr. McLaren for doing an audit during a "settlement" period with FTI.

80.     Upon information and belief, UCSF took no action to correct the above-stated overbilling and inaccurate billing, and did not self-report the inaccuracies and repay overbillings to CMS or any other entity.  Upon information and belief, UCSF has caused no repayment or corrections to issue.

81.     JUAN's efforts to resolve the improper billing practices throughout the foregoing years resulted in workplace retaliation in the form of a *de facto* demotion, the diminishment of her authority, and the diminishment of the health and safety of the workplace.  JUAN nonetheless continued to point out problems with the billing practices.  UCSF subsequently terminated Ms. JUAN's employment.

82.     On June 28, 2013, Dr. Engstrom raised an issue, via e-mail, with the Department of Neurology's leadership later added to the thread, regarding the inability of the so-called "ApeX" electronic medical record system to bill coherently for epilepsy telemetry services managed by Christopher Holland ("Mr. Holland").

83.     On July 30, 2013, JUAN e-mailed the leadership of the Department of Neurology a chart summarizing the various issues "that are still occurring from our audit of all charges filed from

January 2013 to June 2013." JUAN thereafter asked for help in resolving "the multi-layer problems, especially the build," referring to the APeX system. (*Id.*) The chart shows there were:

- 228 instances of mismatch coding for Professional Billing ("PB") and Hospital Billing ("HB");
- 19 instances of duplicate entries for both HB and PB, respectively;
- 3 instances of duplicate entries *and* mismatched coding for HB and PB charges;
- 126 instances of missing PB Charges per the Charge Router Reconciliation Report ("CRRR"); and
- 119 instances of missing HB Charges per the CRRR.

84.   The chart revealed that the average PB charge per encounter was one thousand two hundred seventeen dollars ($1,217.00), and the average HB charge was nine thousand one hundred twenty-seven dollars ($9,127.00), resulting in a material misstatement of the services billed to Medicare, private insurers, and health plans.

85.   That same day, July 30, 2013, then-Financial Applications Director of Clinical Information Systems (currently Vice President, Clinical Systems) Heidi Collins ("Ms. Collins") responded to JUAN's chart summary, opining that the underlying issue was that the professional and technical fees are triggered separately, due to historical lag issues on the professional fees ("pro-fee") side. UCSF, however, took no action to identify the billing errors or correct any incorrect submissions to Medicare.

86.   On August 2, 2013, JUAN responded to Collins' take on the issue, with all of the Department of Neurology senior management included in the e-mail. JUAN acknowledged that there is historically a charge lag on the pro-fee side due to the "correct coding initiative." However, in reviewing this small sample, JUAN and her team uncovered significant compliance issues with charges being triggered separately, which must be retrospectively corrected with the Compliance Department's assistance.

87.   To date, the inaccurate billings identified in JUAN's July 30, 2013 chart have not all been corrected by UCSF and not within the 60 days after these claims were identified.

88.     The problem with pro and tech fees being triggered separately, impacts not only epilepsy telemetry service, but also many service areas at UCSF.

89.     On January 21, 2015, in an e-mail addressed to leadership of the Department of Neurology, JUAN again pointed out how charge-entry lag was an ongoing issue within the department, and that the Faculty Practice Organization ("FPO") should establish guidelines.

90.     On April 7, 2015, JUAN alerted the Compliance Department that patients who had previously been treated by UCSF were being improperly coded as new patients. Prior to the implementation of APeX electronic medical record system, there were Ingenix Claims Manager ("ICM") edits put in place so that the Department of Neurology would catch these upcoding claims prior to submission in the IDX system. Since the implementation of Apex Electronic Medical Record, however, UCSF's Medical Group Billing Department ("MGBS") decided to not institute the edits, citing the rationale of utilizing three years' worth of data before implementing the edits. Without informing any clinical departments of this decision, including the Department of Neurology, that this edit was not in place, follow-up patients were erroneously billed as new patients, with a resulting overbilling to Medicare and Medi-Cal reimbursements.

91.     The failure to determine whether a given patient has previously been seen and treated by UCSF physicians as a registered inpatient or outpatient, or by the hospital within the past three years, has resulted in numerous instances of so-called "upcoding," where UCSF bills Medicare for reimbursement for allegedly new patients, when the correct billing would be that they are follow-up patients pursuant to 73 Fed. Reg. 68679 (November 18, 2008). The Office of the Inspector General ("OIG") published this particular issue to investigate in the Fiscal Year 2015 Workplan.

92.     Medicare recognizes "new patient" to mean a patient who has not received any professional services from the physician or physician group practice (same taxonomy) within the

previous three-year time period.  (Publication 100-04, Chapter 12, Section 30.6.7 of the

Medicare Claims Processing Manual.)  For example, Medicare only recognizes two taxonomies

related to Neurology: specifically, provider taxonomy codes "2084N0400X" and

"2084N0402X."

93.     On September 18, 2015, JUAN alerted the Compliance Department regarding a finding

of incorrect billing in the Department of Neurodiagnostics, managed by Mr. Holland.  This

service was built similar to the EEG telemetry service with the pro and tech fee being triggered

separately.  JUAN provided a chart summarizing the "myriad of misbilling issues similar to the

systematic issue we uncovered in the EEG billing" for one provider from 2011 to 2015.  The

chart shows there were:

- 73 instances of no HB charges;
- 34 instances of no PB charges;
- 17 instances of mismatched codes; and
- 14 instances of incorrect dates on HB or PB charges.

94.     On September 24, 2015, JUAN alerted the Compliance Department again regarding

another improper billing of another provider from 2012 to 2015 from the UCSF

Neurodiagnostics Center.  JUAN provided a chart summarizing the issues for the provider from

2012 to 2015.  The chart shows there were:

- 51 instances of no HB charges;
- 8 instances of no PB charges;
- 5 instances of mismatched codes;
- 3 instances of incorrect dates on HB or PB charges; and
- 10 instances of duplicate coding.

95.     JUAN's supervisor, David Morgan, blatantly dismissed her complaints identifying

substantial deficiencies triggering UCSF's duties under Medicare certification to promptly self-

report and correct overpayments.  The e-mail cavalierly deprecated the issue: "Is it worth

spending time on these issues that are more than 12 months old."

## ECFMG J-1 MISBILLING VIOLATING FEDERAL REGULATIONS

96.     UCSF is a sponsor of foreign national physicians who seek entry into U.S. programs of graduate medical education or training on the J-1 visa, a temporary nonimmigrant visa reserved for participants in the Exchange Visitor Program, sponsored by the Educational Commission for Foreign Medical Graduates ("ECFMG").  In accordance with the federal J-1 regulations, J-1 physicians are considered to be trainees and are therefore prohibited from independent billing.

97.     On March 12, 2012, JUAN raised the issue of a foreign national physician in the Department of Neurology who was incorrectly categorized in the credentialing system as a Clinical Instructor, which allowed him to bill independently in the APeX system without an attending co-signature from a domestic physician.  JUAN endeavored to clarify UCSF billing practices for the classification of physician trainees with J-1s at UCSF, and was advised incorrectly to obtain a "waiver" for them to bill independently by Mr. McLaren.  Further, the Office of Graduate Medical Education advised JUAN that this practice was permitted as part of the non-ACGME fellowship scope of training programs for UCSF.  JUAN sought guidance directly from ECFMG, which apprised her on a phone call that this was not a permitted billing practice.

98.     On March 26, 2012, JUAN immediately alerted Dr. Engstrom, as well as the UCSF Office of Compliance and Legal Affairs in an e-mail correspondence to Director of Compliance Eileen Kahaner ("Ms. Kahaner") and Legal Counsel Ann Sparkman ("Ms. Sparkman"), explaining this systemic issue.  Upon her investigation, Ms. Kahaner informed the Department of Neurology that the above-described practice was not allowable, and that she would be issuing a global update; however, UCSF has taken no corrective action, and has not returned any overpayment on claims from Medicare and other government payers billed by the J-1 ECFMG trainee physicians.

99.     Based upon the multiple complaints and issues raised by JUAN, and the blatant failure to act and remedy the foregoing overbilling by the Department of Neurology and the Department of Compliance, UCSF has acted with reckless disregard for its compliance with the laws governing the submission of claims to CMS.

## FALSE CERTIFICATION

100.    UCSF and the individual Defendants explicitly undertook to comply with a law, rule, and regulation that was implicated by the certification.

101.    Defendants explicitly undertook to comply with a law, rule, and regulation that was implicated in the submission of a claim.

102.    As set forth above, UCSF submitted claims for Medicare reimbursement that did not comply with the law, rule, and regulation upon which certification was made.

103.    As set forth above, UCSF submitted the claims even though it knew it was not in compliance with the law or regulation.

104.    UCSF and the individual Defendants knew that the claims submitted for Medicare reimbursement were overbilled and over-coded by virtue of the fine of one million dollars ($1,000,000.00) imposed by Medicare upon the Department of Neurology.

105.    UCSF and the individual Defendants knew that the overbillings set forth above were in an amount that materially affected UCSF's certification under Medicare.

106.    UCSF and the individual Defendantsfailed to report the overbilling and over-coding and withheld information about its non-compliance with material requirements of certification.

## QUANTUM OF MONETARY HARM TO THE GOVERNMENT

107.    The scope of UCSF billings submitted for Medicare and Medicaid reimbursement is in the hundreds of millions of dollars annually.

23

108.    According to the Office of the Controller, for fiscal year 2015, UCSF Medical Center as a whole had the following revenues from Medicare and Medi-Cal:

"Total Medical Center revenues increased $299 million, or 13 percent, to $2.7 billion in 2015. The increase was primarily due to improved inpatient and outpatient volumes, an increase in the complexity of cases, and a slight change in the mix of payors to those with better contracted rates. The table below summarizes the revenue sources of the Medical Center:"

| *(in millions of dollars)* | 2015 | 2014 | $ Change | % Change |
|---|---|---|---|---|
| Medicare | $ 493 | $ 462 | $ 31 | 7% |
| Medi-Cal | 209 | 195 | 14 | 7 |
| Contracts | 1,843 | 1,619 | 224 | 14 |
| County/uninsured/self-pay | 35 | 33 | 2 | 6 |
| **Net patient service revenue** | 2,580 | 2,309 | 271 | 12 |
| Other revenue | 109 | 81 | 28 | 35 |
| **Medical Center, net** | **$2,689** | **$2,390** | **$299** | **13%** |

109.    In 2015, according to the Office of the Controller, Medicare billings comprised 18.3% of the Medical Center's revenue, and Medi-Cal comprised 7.7% of total billings. As a result, over one-fourth of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

110.    Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $39.44 million dollars in fiscal year 2015 alone.

111.    According to the Office of the Controller, for fiscal year 2013, UCSF Medical Center as a whole had the following revenues from Medicare and Medi-Cal:

"Total Medical Center revenues increased $189 million, or 10 percent, to $2.16 billion in 2013. The increase was primarily due to improved inpatient and outpatient reimbursement rates, an increase in the complexity of cases, and a slight change in the mix of payors to those with better contracted rates. The table below summarizes the revenue sources of the Medical Center:"

24

| (in millions of dollars) | 2013 | 2012 | $ Change | % Change |
|---|---|---|---|---|
| Medicare | $ 416 | $ 371 | $ 45 | 12% |
| Medi-Cal | 164 | 184 | (20) | (11) |
| Contracts | 1,463 | 1,339 | 124 | 9 |
| County/uninsured/self-pay | 55 | 51 | 4 | 8 |
| Other | 66 | 30 | 36 | 120 |
| **Medical Center, net** | **$2,164** | **$1,975** | **$189** | **10%** |

112.    In 2013, according to the Office of the Controller, Medicare billings comprised 19.2% of the Medical Center's revenue, and Medi-Cal comprised 7.5% of total billings.  As a result, over one-fourth of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

113.    Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $33.28 million dollars in fiscal year 2013 alone.

114.    According to the Office of the Controller, for fiscal year 2011, UCSF Medical Center as a whole had the following revenues of approximately $367 million dollars ($367,000,000) from Medicare and $216 million dollars ($216,000,000) from Medi-Cal.  The Medical Center's total revenue for fiscal year 2011 was approximately $1.923 billion dollars ($1,923,000,000).

115.    In 2011, according to the Office of the Controller, Medicare billings comprised 19.08% of the Medical Center's revenue, and Medi-Cal comprised 11.2% of total billings.  As a result, about 30% of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

116.    Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $29.36 million dollars in fiscal year 2011 alone.

117.    Based on information and belief, for fiscal year 2010, UCSF's Office of the Controller reported revenues from Medicare and Medi-Cal as a combined amount rather than separate and distinct revenue items.  Based on information and belief, prior to 2010, UCSF did not report the specific amounts of revenues received from Medicare or Medi-Cal at all.  Accordingly, the following extrapolations are made to provide an estimate of the quantum of harm based on the ascertainable data:

118.    According to the Office of the Controller, for fiscal year 2010, UCSF Medical Center as a whole had revenues of approximately $559 million dollars ($559,000,000) from Medicare and Medi-Cal combined.  The Medical Center's total revenue for fiscal year 2011 was approximately $1.784 billion dollars ($1,784,000,000).

119.    As a result, about 31% of Medical Center revenue in 2011 derived from Medicare and Medi-Cal reimbursements.

120.    Between fiscal years 2011-15, Medicare billings accounted for an average of about 68.4% of the Medical Center's combined revenue derived from Medicare and Medi-Cal.  Thus, by extrapolation, the Medical Center derived about $382.3 million dollars from Medicare billings in 2010.  Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $30.58 million dollars in fiscal year 2010 alone.

121.    According to the Office of the Controller, the approximate total annual reported revenues for UCSF Medical Center and related activities were as follows for fiscal years 2004-09: $1.82 billion (2009); $1.65 billion (2008); $1.54 billion (2007); $1.39 billion (2006); $1.26 billion (2005); and $1.19 billion (2004).  Thus, between fiscal years 2004-09, UCSF received

26

approximately $8.86 billion dollars in total revenue from the Medical Center and related activities.

122.    Between fiscal years 2011-15, Medicare billings accounted for an average of 18.95% of the Medical Center's total annual revenue.  Thus, by extrapolation, from fiscal years 2004-09, Medicare billings accounted for about $1.64 billion in revenues.

123.    Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $131.2 million dollars in fiscal years 2004-09 alone.

124.    Absent an Order from the Court enjoining the practices set forth above, the loss to the Government will continue in the future.

### NONMONETARY HARM

125.    The practices set forth above also carry with them non-economic harm: by not transmitting findings and the results of the referral back to the referring physician, very important medical care is not being rendered, and when it is being rendered, it is being slowed in a fashion that places the health and safety of referred patients at increased risk.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, through Plaintiff-Relator, requests the Court enter the following relief:

1.    That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil

penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.     That Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

4.     That Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.     That Plaintiff-Relator recover such other relief as the Court deems just and proper.


Dated: September 16, 2016                      SMITH PATTEN



                                              _/s/  Dow W. Patten_
                                              DOW W. PATTEN
                                              Attorneys for Plaintiff-Relator
                                              DIANA JUAN


### JURY DEMAND

Plaintiff-Relator demands trial by jury of all matters so triable.


Dated: September 16, 2016                      SMITH PATTEN



                                              _/s/  Dow W. Patten_
                                              DOW W. PATTEN
                                              Attorneys for Plaintiff-Relator
                                              DIANA JUAN