SMITH PATTEN
DOW W. PATTEN (SBN: 135931)
888 S. Figueroa St., Suite 2030
Los Angeles, CA 90017
Telephone (415) 402-0084; (213) 488-1300
Facsimile (415) 520-0104

Attorney for Plaintiff-Relator
DIANA JUAN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Ex rel*. DIANA JUAN,<br><br>        Plaintiff,<br><br>    v.<br><br>SAM HAWGOOD; STEPHEN HAUSER;<br>EILEEN KAHANER; GRETA<br>SCHNETZLER; CLIFF SKINNER;<br>OLONERGAN; SHERYL VACCA, and<br>DOES 1 through 10, inclusive,<br><br>        Defendants. | **Case No.**: CV 16-4034-CW<br><br>**SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S SECOND AMENDED COMPLAINT
PURSUANT TO 31 U.S.C. §§ 3729-3732
OF THE FEDERAL FALSE CLAIMS ACT**

The United States of America, by and through *qui tam* relator DIANA JUAN ("Plaintiff-Relator" or "JUAN"), brings this action under 31 U.S.C. § 3729, *et seq*., as amended ("False Claims Act"), to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States Government ("Government").

1

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729-3730.

2.      There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

3.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because all the Defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in the Northern District of California.

4.      Venue is proper in this Court pursuant to 31 U.S.C. § 3730(b)(1) because all of the Defendants have at least minimum contacts with the United States, and all the defendants can be found in, reside, or transact or have transacted business in the Northern District of California.

5.      Pursuant to the requirements of 31 U.S.C. § 3730(b), Plaintiff-Relator has provided the Government with a confidential written disclosure statement of material and information regarding the alleged violations.

6.      The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty ranging from a minimum of five thousand five hundred dollars ($5,500) to a maximum of eleven thousand dollars ($11,000) for each such claim , plus three times the amount of the damages sustained by the Government. The False Claims Act allows any person having information about a false or fraudulent claim against the Government to bring an action for herself and the Government , and to share in any recovery . The False Claims Act requires that

Second Amended Complaint                                          Case No. : 16-cv-4034-CW

the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

7.    Under Medicare, physicians, hospitals, and clinics each have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims.

## INTRODUCTION

8.    This is an action for treble damages and penalties for each false claim and each false statement under the False Claims Act committed by the University of California San Francisco School of Medicine/Medical Center throughout all its constituent departments.  31 U.S.C. § 3729, *et seq*.; *see also* 42 U.S.C. § 1320a-7k(d)(2); 42 U.S.C. § 1320a-7k(d)(4)(B).

## THE PARTIES

9.    Plaintiff-Relator JUAN was an individual formerly employed by Defendants as Administrative Director, Clinical Operations at UCSF Medical Center, and has witnessed practices at Defendants which result in and constitute false claims under the False Claims Act.

10.    Defendant SAM HAWGOOD, is the current Chancellor and former Dean of the Medical School of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

11.    Defendant STEPHEN HAUSER, is the Director of Weill Institute of Neurosciences and former Chair of Neurology of Defendant UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims .

3

12.     Defendant EILEEN KAHANER, is the Clinical Compliance Director of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

13.     Defendant GRETA SCHNETZLER, originally sued as DOE 9, is the Chief Legal Counsel of UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

14.     Defendant CLIFF SKINNER, originally sued as DOE 10, is the Vice President, Revenue Cycle of UCSF Medical Center, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

15.     Defendant THERESA O'LONERGAN, originally sued as DOE 11, is the former Director of Compliance and Ethics at UCSF, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

16.     Defendant SHERYL VACCA, originally sued as DOE 12, is the former Senior Vice President and Chief Compliance and Audit Officer Office of Ethics, Compliance and Audit Services, University of California, Office of the President, and is responsible for the acts and omissions set forth below constituting the submission of False Claims.

## OVERVIEW OF MEDICARE BILLING & REIMBURSEMENT

17.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.  Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

4

18.     Medicare has two parts relevant to the instant action: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A.

19.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals and skilled nursing facilities (not custodial or long-term care).  Medicare Part A also helps cover hospice care and some home health care.

20.     Under Medicare Part A, the amount paid by Medicare to a hospital for inpatient services is based primarily on the particular diagnosed illness or condition that led to the patient's admission to the hospital, or the patient's illness or condition that is principally treated by the hospital; as such, the correct and appropriate coding of services and identification of patients are a material part of compliance with the requirements of Medicare Part A.

21.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care.  It also covers some other medical services that Part A does not (i.e., physical and occupational therapist services, etc.).  Part B helps pay for covered health services and supplies when they are medically necessary.

22.     Payments from the Medicare Program come from the Medicare Trust Fund, which is funded through payroll deductions in addition to government contributions.  Over the last 50 years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

23.     Medicare is administered by the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS.

24.     To bill Medicare and receive reimbursement for claims for inpatient services, a hospital must file a provider agreement with the Secretary of HSS.  42 U.S.C. § 1395cc.  The provider

5

agreement conditions reimbursement for claims on compliance with the requirements of applicable statutes and regulations.

25.     A large portion of the day-to-day administration and operation of Medicare is managed through private insurers under contract with the federal government and, in particular, CMS.

26.     To assist in the administration of Medicare Part A, CMS contracts with fiscal intermediaries.  *See* 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports in accordance with rules developed by the Health Care Financing Administration ("HCFA"), now known as CMS.

27.     Under Medicare Part B, the Government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas.  These private insurance companies, or "Medicare Carriers," are responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

28.     The principal function of both fiscal intermediaries and Medicare Carriers is to make and audit payments for Medicare services to assure that federal funds are spent according to law and regulation.

29.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the Medicare Carriers and fiscal intermediaries.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.  *See* 42 § C.F.R. 421.5(b).

30.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary.  Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

6

31.     Additionally, providers who wish to be eligible to participate in Medicare Part A must periodically submit an application to participate in the program.  The application, which must be signed and/or electronically submitted by an authorized representative of the provider, contains a certification statement: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. […] I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

## MEDICARE CERTIFICATION

32.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form, CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claims that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

33.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider claims it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider had been overpaid and must reimburse Medicare.  *See* 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1).

34.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient services during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then

7

totaled with any other Medicare Part A liabilities to the provider. This total determines

Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course

of a fiscal year. From this sum, the payments made to the provider during the year are subtracted

to determine the amount due to the Medicare Part A program or the amount due to the provider.

35.      Under the rules applicable at all relevant times, Medicare, through its fiscal

intermediaries and MACs, had the right to audit the hospital cost reports and financial

representations made by Defendants to ensure their accuracy and preserve the integrity of the

Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital

cost reports previously submitted by a provider if any overpayments have been made. *See* 42

C.F.R. § 413.64(f).

36.      Every hospital cost report contains a "Certification" that must be signed by the chief

administrator of the provider or a responsible designee of the administrator.

37.      For all relevant years, the responsible designee for Defendants' Medical Center was

required to certify, and did certify, in pertinent part: "to the best of my knowledge and belief,

[the hospital cost report] and statement are true, correct, complete, and prepared from the books

and records of the provider in accordance with applicable instructions, except as noted. I further

certify that I am familiar with the laws and regulations regarding the provision of health care

services, and that the services identified in this cost report were provided in compliance with

such laws and regulations."

38.      For the entire period at issue, the hospital cost report certification page also included the

following sentence: "Misrepresentation or falsification of any information contained in this cost

report may be punishable by criminal, civil and administrative action, fine and/or imprisonment

under federal law. Furthermore, if services identified in this report were provided or procured

through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

39.     Thus, the provider must certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including Medicare and Medicaid laws and regulations.

40.     For each of the years at issue, UCSF Medical Center submitted cost reports attesting, among other things, to the certification quoted above.

41.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports).

42.     For each of the years at issue, UCSF submitted cost reports attesting, among other things, to the certification quoted above.

43.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports).

44.     UCSF's Code of Conduct, Policy No. 1.20.09, applicable to all Individual Defendants herein, provides in pertinent part:

> h. Management is responsible for establishing and maintaining an effective internal control structure to minimize organizational risk for inappropriate billing and collection activities. Internal controls include, but are not limited to, effective training and educational programs and periodic auditing. Procedures to evaluate and monitor coding and billing must be implemented and reviewed on an ongoing basis.

45.     UCSF's governing structure includes the UCSF Medical Center Compliance Committee, which oversees implementation of the Clinical Enterprise Compliance

9

Program at UCSF Medical Center and regularly reports to the Clinical Enterprise

Compliance Committee. Members of the committees include leaders from Medical

Center management, Audit Services, and the Clinical Enterprise Compliance Program.

46.     The Director of the Clinical Enterprise Compliance Program (CECP) (Eileenevaluate and

Kahaner) is responsible for daily operations of the CECP.  The Director reports to the

UCSF Chief Ethics and Compliance Officer (Theresa O'Lonergan), who reports to the

UCSF Executive Vice Chancellor and Provost.  The Director is supported by Audit

Services, Legal Affairs, ad hoc operations committees, and other resources as needed to

implement the program.

47.     At all times herein, upon information and belief, each of the individual Defendants had

knowledge of the false claims, and the ability to correct some or all of  the systemic failures

throughout all departments at UCS that led to the submission of false claims, the ability to repay

overbillings or misbillings previously identified, and consciously and willfully chose not to do

so.

48.     At all times herein, upon information and belief, each of the individual Defendants had

knowledge of the false claims, and the ability to correct some or all of the systemic failures

throughout all departments at UCSF that led to the submission of false claims, the ability to halt

or correct the required recertification set forth above, and willfully chose not to do so.


**OVERVIEW OF MEDICAID BILLING & REIMBURSEMENT**

49.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added

to the Social Security Act.  The Medicaid program aids the states in furnishing medical assistance

to eligible needy persons, including indigent and disabled persons.  Medicaid is the largest source

of funding for medical and health-related services for America's poorest people.

10

50.     Medicaid is a cooperative federal-state public-assistance program, which is administered by the states.  In California, the Medicaid program is called Medi-Cal and is administered by the California Department of Health Care Services ("DHCS"), a department within the California Health and Human Services Agency ("CHHS").

51.     Funding for Medicaid is shared between the Government and those state governments that choose to participate in the program.  Federal support for Medicaid is significant.  For example, the Government provides 50% of the funding for Medi-Cal, while the State of California funds the other half.

52.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), (30)(A).

53.     Like Medicare Part B, Medi-Cal pays providers for services actually rendered, as represented on the claim form, and services that are reasonable and medically necessary.

54.     By becoming a participating provider in the Medi-Cal program, UCSF Medical Center agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

## CONDITIONS OF PARTICIPATION

55.     In order to obtain reimbursement from Medicare or Medi-Cal for inpatient and outpatient diagnostic procedures like magnetic resonance imaging ("MRIs") and electroencephalograms ("EEGs"), a provider must comply with a strict statutory and regulatory scheme administered by DHCS (for Medi-Cal) and CMS (for Medicare).  In order to receive reimbursement from the Government, providers must comply with numerous "Conditions of Participation" that define the procedures and standards of care which must be followed in the course of treatment.

11

56.     Compliance with the Conditions of Participation is material to the decision by both the Government and the State of California to pay Medicare or Medi-Cal claims, and providers implicitly certify that they have complied with these Conditions of Participation each time they present a claim for goods and services.

57.     Participation in Medi-Cal requires meeting all requirements for participation in Medicare. 42 C.F.R. § 482.1(a)(5).

58.     As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital "must be in compliance with applicable Federal laws related to the health and safety of patients." 42 C.F.R. § 482.11(a). The hospital must also "assure that personnel are licensed or meet other applicable standards that are required by State or local laws." 42 C.F.R. § 482.11(c).

59.     As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital must have "an effective governing body that is legally responsible for the conduct of the hospital." 42 C.F.R. § 482.12.

60.     Additionally, as a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, the "provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment." 42 C.F.R. § 424.5(a)(6).

61.     The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of [*inter alia*, subparagraphs (A), (B), or (G)];
>
> […]
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or

12

knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $ 10,000, […] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C), (G).  The False Claims Act thereafter defines the requisite scienter for a violation:

[T]he terms "knowing" and "knowingly"--

(A) mean that a person, with respect to information--

(i)  has actual knowledge of the information;
(ii)  acts in deliberate ignorance of the truth or falsity of the information; or
(iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)  require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1)(A)-(B).  Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 ("ACA") amended the Social Security Act by adding a new provision that addresses what constitutes an "overpayment" under the False Claims Act in the context of a federal health care program.  Under this section, an "overpayment" is defined as "any funds that a person receives or retains under Title XVIII or XIX […] to which the person, after applicable reconciliation, is not entitled."  42 U.S.C. § 1320a-7k(d)(4)(B).  In addition, an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified."  42 U.S.C. § 1320a-7k(d)(2).

62.    Failure to return any overpayment constitutes a reverse false claim actionable under the False Claims Act.  31 U.S.C. § 3729(a)(1)(G).

## FACTUAL ALLEGATIONS OF FALSE CLAIMS ACT VIOLATIONS

63.    In 2003, JUAN joined the Department of Neurology as the Practice Manager of Neurology Outpatient Practice.  She was responsible for oversight of the efficient organization and operation of the clerical and reception activities of the Neurology Outpatient Practice.  This

13

included managing clerical staff, developing and maintaining clerical procedures, proposing operational policy improvements, and monitoring the following: the patient appointment system and physician clinical schedules, communications systems, database entry, medical record custody, patient reception, and phone systems (including voicemail systems).

64.     Additionally, in collaboration with the Neurology Clinical Services Manager, Director of Administration, and Vice-Chair, JUAN analyzed outpatient practice financial operations and made policy and procedure recommendations.  She also assisted in the monitoring and controlling cost center expenditures, reconciled expenditures to the general ledger, and summarized activity to the Clinical Services Manager.

65.     In 2007, JUAN earned a promotion to the position of Administrator Director, Clinical Operations position for the Neurology Department. In this position, she managed plans and directed the clinical operations and resources of the Department of Neurology's Inpatient and Outpatient Services. She was responsible for the inpatient neurology stroke/intensive care unit ("ICU"), epilepsy, and ward-consult services, the Ambulatory Care Center Clinics on the eighth floor, and the Mt. Zion Headache Clinic . This included all clinical and business operations, as well as financial, human, and other resources for several subspecialities in the Neurology Clinical Practices . ruAN was responsible for the administration of all patient activities , ensuring that the strategic goals were met for the delivery of high-quality, cost-effective health care services in alignment with Medical Center, federal, state, and local laws and regulations.

66.     Between 2007 and 2009, JUAN tasked her staff with investigating and tracking problems with "provider dictations" because there were complaints from referring physicians that they were not receiving them.  The staff manually reconciled every list to ensure that there was corresponding documentation.  The original hypothesis as to the source of the problem was that the Health Information Management Systems ("HIMS") had operational issues, but JUAN and

14

her staff soon discovered that there was a different issue.

67.     JUAN and her staff identified systemic and long-standing issues in UCSF's Department of Neurology: providers were not generating reports after a patient visit.  Various dispositions include: (i) reports not being generated in a timely manner to referring physicians; (ii) patient visits occurring with no reports; and (iii) instances of illegible medical notes.  In response, JUAN and her staff reported their findings to departmental leadership, Dr. John Engstrom, M.D. ("Dr. Engstrom") and Dr. Stephen Hauser, M.D. ("Dr. Hauser"), to improve the physician documentation.

68.     Upon information and belief, numerous encounters or patient visits were submitted for reimbursement by CMS without the necessary legible reports submitted to referring physicians.

69.     These issues have remained ongoing despite their disclosure to the leadership of UCSF's Department of Neurology for many years.  There is a significant likelihood that the above-described fraud has been committed prior to 2007, considering that there was no mechanism in place to ensure that proper documentation was synchronized with submissions to Medicare and Medi-Cal.  Because this issue is not unique to the Department of Neurology, there is a significant probability that this fraud was also occurring in other clinical departments at UCSF.

70.     Prior to 2009, documentation for outpatient patient visits were handwritten on paper charts, dictated into a database called "STOR," some combination of both, or none of the above (and documentation was unsynchronized to the billing of these visits).  Billing staff would receive submitted paper copies of encounter forms and manually enter the information into the "IDX" system created by the IDX Systems Corporation, a healthcare software technology vendor used by UCSF Medical Center for scheduling, billing and collection, etc.

71.     As the Administrative Director of UCSF Clinical Operations, JUAN was responsible for all administrative aspects of the Department of Neurology, including but not limited to internal

15

controls, billing, and staffing.  Beginning in early 2009, after her promotion to this position, JUAN uncovered inconsistencies and inefficiencies in the billing practices within the Department of Neurology.

72.    Specifically, JUAN observed that charges were missing, that UCSF-submitted billings for reimbursement by Medicare and other payers were incorrectly coded based on the documentation, and that UCSF's billings lacked the proper documentation required by Medicare. JUAN immediately informed Dr. Engstrom, the Chief of Clinical Services, and Jane Czech ("Ms. Czech"), the Director of Administration, about these major billing discrepancies.   The Chair of Neurology, Dr. Hauser, also had known or been made aware of these billing and compliance issues.  Over the next few months, JUAN and her team made a significant financial turnaround for clinical services, working to fix the long-standing billing issues.

73.    JUAN proposed that the Department of Neurology create a dedicated billing unit, which Ms. Czech agreed on or around April 28, 2009 to authorize her to implement.

74.    Ms. Czech recognized JUAN for her role in the "[Neurology Department's] financial turnaround" and agreed with JUAN on a new leadership structure that would enable JUAN to focus on the billing and collections to further enhance and sustain the achievements she and her team had already made.

75.    For example, a snapshot as of November 24, 2009 indicated there were 775 unsigned letters, 286 greater than 14 days.  This statistic, as dismal as it was, represented a drastic improvement of the pre-existing problem prior to the project initiated by JUAN in 2007.

76.    In or about 2009, JUAN, as the new Administrative Director of Clinical Operations, was pulled into the tail end of Medicare settlement discussions with UCSF representatives resulting from a Medicare audit for improper billing practices perpetrated by the Memory and Aging Center within the Department of Neurology.  JUAN assisted that division in securing a pre-

Second Amended Complaint                                    Case No. : 16-cv-4034-CW

submission accuracy score of 95% Pre-Bill Quality Review ("PBQR") with Medicare and other payers.  The Memory and Aging Center was eventually fined approximately one million dollars ($1,000,000.00) by Medicare for misbillings.  As part of that settlement, the Department of Neurology was placed on a PBQR that required 95% compliance prior to the submission of a billing.

77.     UCSF uses five-digit Current Procedural Terminology Codes ("CPTs") to describe and categorize physician-encounters in order to facilitate billing with payors, such as CMS and private insurance companies.  Each billable procedure has an applicable CPT code.

78.     The Evaluation and Management ("E&M") coding process determines which physician-patient encounters become CPTs.  Different E&M codes apply to different types of physician-patient encounters, such as office visits or hospital visits.  Within each type of encounter, the CPT code methodology provides for different levels of care, which CMS reimburses at different rates.  For example, the "99214" code may be used to charge for an office visit with an established patient.  There are five levels of care for this type of encounter.  The "99214" code is often referred to as a "level 4" office visit because the code ends in "4" and also because it is the fourth "level of care" for that type of visit.  (The code "99215" signifies the fifth and highest level of care.)  Each physician-patient encounter may be viewed as a unique procedure which requires specific documentation.

79.     In light of the substantial fine it incurred for Medicare misbilling, UCSF was clearly on notice that its internal systems were unable to comply with Medicare's certification procedures, at least as early as 2009, and upon information and belief, earlier to that time.

80.     In June 2010, the University of California, Office of the President engaged FTI Consulting ("FTI"), which conducted a probe audit of several clinical departments to determine the accuracy of the line item E&M code selection based upon clinical documentation to support

payments received from CMS for Medicare-facility-fee claims for the time period starting on January 1, 2007 and ending December 31, 2009.  The probe audit revealed a very high error rate in over-coding and overbilling greatly exceeding the under-coding and underbilling to both private insurers and Medicare.

81.     As a result of the audit, UCSF's School of Medicine mandated that the Department of Neurology and other clinical departments outsource the E&M process—i.e., reviewing patient admissions and encounters, charts, and notes to apply the correct CPT codes—and discontinue the practice of relying on individual physicians to apply the appropriate CPT codes to their physician-patient encounters.  However, at no time did UCSF or any of its departments implement a Quality Assurance policy for the monitoring the external coders.

82.     During this time, JUAN endeavored to ensure that the new process of utilizing external coders was compliant with Medicare coding requirements.  Specifically, JUAN inquired as to what mechanisms would be instituted to validate the coding accuracy.  This issue was raised with Department of Neurology leadership, UCSF's Director of Compliance, and other leadership from the School of Medicine.  JUAN uncovered significant coding inaccuracies with some of the coding vendors, and as a result, she commissioned Aviacode, a neurology vendor, to complete an audit in 2011.  One audit of 309 physician notes revealed that 4% were overcoded, with an accuracy rate of 59.2%.  Overcoding occurs when the wrong code is used, resulting in excess billing and revenue either to Medicare or to private insurers and health plans.

83.     Another audit of 294 total documents revealed that 22.9% were overcoded, with an accuracy rate of 41.9%.  JUAN escalated these results to the Department of Neurology's leadership, Ms. Czech and Dr. Engstrom, as well as the Director of Revenue Management, Kevin McLaren ("Mr. McLaren").  Dr. Hauser was also aware of these misbilling issues.  In response, JUAN was chastised by Mr. McLaren for doing an audit during a "settlement" period with FTI.

84.    The individual Defendants, who were employed at the time,  upon information and belief, knew as early as 2009 and likely earlier, of the substantial over-coding which continued to occur after the FTI audit, that the over-coding resulted in overpayments under Medicare, and did not take action to self-report the overpayments to Medicare.

85.    Each individual Defendant, knew as early as 2009 an likely earlier, that UCSF continued to certify its compliance with Medicare rules and regulations, and knew at the time of the certification, that UCSF had not self-disclosed overpayments which were the result of the systemic overbilling set forth above, and did not take action to halt or correct the certification.

86.    Upon information and belief, UCSF took no action to correct the above-stated overbilling and inaccurate billing, and did not self-report the inaccuracies and repay overbillings to CMS or any other entity.  Upon information and belief, UCSF has caused no repayment or corrections to issue.

87.    JUAN's efforts to resolve the improper billing practices throughout the foregoing years resulted in workplace retaliation in the form of a *de facto* demotion, the diminishment of her authority, and the diminishment of the health and safety of the workplace.  JUAN nonetheless continued to point out problems with the billing practices.

88.    On June 28, 2013, Dr. Engstrom raised an issue, via e-mail, with the Department of Neurology's leadership later added to the thread, regarding the inability of the so-called "ApeX" electronic medical record system to bill coherently for epilepsy telemetry services managed by Christopher Holland ("Mr. Holland").

89.    On July 30, 2013, JUAN e-mailed the leadership of the Department of Neurology a chart summarizing the various issues "that are still occurring from our audit of all charges filed from January 2013 to June 2013."  JUAN thereafter asked for help in resolving "the multi-layer problems, especially the build," referring to the APeX system.  (*Id.*)  The chart shows there were:

19

- 228 instances of mismatch coding for Professional Billing ("PB") and Hospital Billing ("HB");
- 19 instances of duplicate entries for both HB and PB, respectively;
- 3 instances of duplicate entries *and* mismatched coding for HB and PB charges;
- 126 instances of missing PB Charges per the Charge Router Reconciliation Report ("CRRR"); and
- 119 instances of missing HB Charges per the CRRR.

90.     The chart revealed that the average PB charge per encounter was one thousand two hundred seventeen dollars ($1,217.00), and the average HB charge was nine thousand one hundred twenty-seven dollars ($9,127.00), resulting in a material misstatement of the services billed to Medicare, private insurers, and health plans.

91.     That same day, July 30, 2013, then-Financial Applications Director of Clinical Information Systems (currently Vice President, Clinical Systems) Heidi Collins ("Ms. Collins") responded to JUAN's chart summary, opining that the underlying issue was that the professional and technical fees are triggered separately, due to historical lag issues on the professional fees ("pro-fee") side. UCSF, however, took no action to identify the billing errors or correct any incorrect submissions to Medicare.

92.     On August 2, 2013, JUAN responded to Collins' take on the issue, with all of the Department of Neurology senior management included in the e-mail.  JUAN acknowledged that there is historically a charge lag on the pro-fee side due to the "correct coding initiative." However, in reviewing this small sample, JUAN and her team uncovered significant compliance issues with charges being triggered separately, which must be retrospectively corrected with the Compliance Department's assistance.

93.     To date, the inaccurate billings identified in JUAN's July 30, 2013 chart have not all been corrected by UCSF and not within the 60 days after these claims were identified.

94.     The problem with professional and technical fees being triggered separately, impacts not only epilepsy telemetry service, but also many other service areas at UCSF.

20

95.    On January 21, 2015, in an e-mail addressed to leadership of the Department of Neurology, JUAN again pointed out how charge-entry lag was an ongoing issue within the department, and that the Faculty Practice Organization ("FPO") should establish guidelines.

96.    On April 7, 2015, JUAN alerted the Compliance Department that patients who had previously been treated by UCSF were being improperly coded as new patients . Prior to the implementation of APeX electronic medical record system, there were Ingenix Claims Manager ("ICM") edits put in place so that the Department of Neurology would catch these up coding claims prior to submission in the IDX system. Since the implementation of Apex Electronic Medical Record, however, UCSF's Medical Group Billing Department ("MGBS") decided to not institute the edits, citing the rationale of utilizing three years' worth of data before implementing the edits. Without informing any clinical departments of this decision, including the Department of Neurology, that this edit was not in place, follow-up patients were erroneously billed as new patients, with a resulting overbilling to Medicare and Medi-Cal reimbursements.

97.    On or about September 28, 2016, after the filing of the present action,  UCSF Medical Center and the Office of Inspector General for the Department of Health and Human Services entered into a settlement agreement covering the period of July 1, 2010 to December 31, 2013 concerning the Evaluation and Management issue set forth above.  Plaintiff-Relator does not claim the charges—which are the subject of that settlement in this action—however, the issue both predated and post-dated the settlement term, and as to such charges, Plaintiff-Relator continues to seek recovery herein.

98.    The failure to determine whether a given patient has previously been seen and treated by UCSF physicians as a registered inpatient or outpatient, or by the hospital within the past three years, has resulted in numerous instances of so-called "upcoding," where UCSF bills Medicare for reimbursement for allegedly new patients, when the correct billing would be that they are

21

follow-up patients pursuant to 73 Fed. Reg. 68679 (November 18, 2008).  The Office of the

Inspector General ("OIG") published this particular issue to investigate in the Fiscal Year 2015

Workplan.  UC and UCSF were clearly on notice by the Office of Inspector General.

99.    Medicare recognizes "new patient" to mean a patient who has not received any

professional services from the physician or physician group practice (same taxonomy) within the

previous three-year time period.  (Publication 100-04, Chapter 12, Section 30.6.7 of the

Medicare Claims Processing Manual.)  For example, Medicare only recognizes two taxonomies

related to Neurology: specifically, provider taxonomy codes "2084N0400X" and

"2084N0402X."

100.    On September 18, 2015, JUAN alerted the Compliance Department regarding a finding

of incorrect billing in the Department of Neurodiagnostics, managed by Mr. Holland.  This

service was built similar to the EEG telemetry service with the pro and tech fee being triggered

separately.  JUAN provided a chart summarizing the "myriad of misbilling issues similar to the

systematic issue we uncovered in the EEG billing" for one provider from 2011 to 2015.  The

chart shows there were:

- 73 instances of no HB charges;
- 34 instances of no PB charges;
- 17 instances of mismatched codes; and
- 14 instances of incorrect dates on HB or PB charges.

101.    On September 24, 2015, JUAN alerted the Compliance Department again regarding

another improper billing of another provider from 2012 to 2015 from the UCSF

Neurodiagnostics Center.  JUAN provided a chart summarizing the issues for the provider from

2012 to 2015.  The chart shows there were:

- 51 instances of no HB charges;
- 8 instances of no PB charges;
- 5 instances of mismatched codes;
- 3 instances of incorrect dates on HB or PB charges; and

22

- 10 instances of duplicate coding.

102.   JUAN's supervisor, David Morgan, blatantly dismissed her complaints identifying substantial deficiencies triggering UCSF's duties under Medicare certification to promptly self-report and correct overpayments.  The e-mail cavalierly deprecated the issue: "Is it worth spending time on these issues that are more than 12 months old."

**ECFMG J-1 MISBILLING VIOLATING FEDERAL REGULATIONS**

103.   UCSF is a sponsor of foreign national physicians who seek entry into U.S. programs of graduate medical education or training on the J-1 visa, a temporary nonimmigrant visa reserved for participants in the Exchange Visitor Program, sponsored by the Educational Commission for Foreign Medical Graduates ("ECFMG").  Upon information and belief, UCSF uses numerous J-1 physicians throughout all departments, not just within the Department of Neurology.

104.   In accordance with the federal J-1 regulations, J-1 physicians are considered to be trainees and are therefore prohibited from independent billing.

105.   On March 12, 2012, JUAN raised the issue of a foreign national physician in the Department of Neurology who was incorrectly categorized in the credentialing system as a Clinical Instructor, which allowed him to bill independently in the APeX system without an attending co-signature from a domestic physician.  JUAN endeavored to clarify UCSF billing practices for the classification of physician trainees with J-1s at UCSF, and was advised incorrectly to obtain a "waiver" for them to bill independently by Mr. McLaren.  Further, the Office of Graduate Medical Education advised JUAN that this practice was permitted as part of the non-ACGME fellowship scope of training programs for UCSF.  JUAN sought guidance directly from ECFMG, which apprised her on a phone call that this was not a permitted billing practice.

23

106.    On March 26, 2012, JUAN immediately alerted Dr. Engstrom, as well as the UCSF

Office of Compliance and Legal Affairs in an e-mail correspondence to Director of Compliance

Eileen Kahaner ("Ms. Kahaner") and Legal Counsel Ann Sparkman ("Ms. Sparkman"),

explaining this systemic issue.  Upon her investigation, Ms. Kahaner informed the Department of

Neurology that the above-described practice was not allowable, and that she would be issuing a

global update; however, upon information and belief, UCSF, through its agents, the individual

Defendants,  has taken no corrective action in any of the departments which have employed or

continue to employ J-1 visa holders, and has not returned any overpayment on claims from

Medicare and other government payers billed by the J-1 ECFMG trainee physicians.

107.    Based upon the multiple complaints and issues raised by JUAN, and the blatant failure to

act and remedy the foregoing overbilling by the Department of Neurology and the Department of

Compliance, Defendants have acted with reckless disregard for its compliance with the laws

governing the submission of claims to CMS.

## **FALSE CERTIFICATION**

108.    UCSF explicitly undertook to comply with a law, rule, and regulation that was implicated

by the certification.

109.    Defendant explicitly undertook to comply with a law, rule, and regulation that was

implicated in the submission of a claim.

110.    As set forth above, UCSF submitted claims for Medicare reimbursement that did not

comply with the law, rule, and regulation upon which certification was made.  Each of the

individual Defendants, upon information and belief, was aware of the submissions, had power to

correct such submissions, and willingly failed to do so.

111.    As set forth above, UCSF submitted the claims even though it knew it was not in

compliance with the law or regulation.  Each of the individual Defendants, upon information and

belief, was aware of the submissions, had power to correct such submissions, and willingly failed to do so.

112.    UCSF knew that the claims it submitted for Medicare reimbursement were overbilled and over-coded by virtue of the fine of one million dollars ($1,000,000.00) imposed by Medicare upon the Department of Neurology.  Each of the individual Defendants, upon information and belief, was aware of the submissions, had power to correct such submissions throughout the various departments over which they had control, and willingly failed to do so.

113.    UCSF knew that the overbillings set forth above were in an amount that materially affected UCSF's certification under Medicare.  Each of the individual Defendants, upon information and belief, was aware of the submissions, had power to correct such submissions throughout the Departments over which they had control, and willingly failed to do so.

114.    UCSF and the individual Defendants failed to report the overbilling and over-coding and withheld information about its non-compliance with material requirements of certification.

## QUANTUM OF MONETARY HARM TO THE GOVERNMENT

115.    The scope of UCSF billings submitted for Medicare and Medicaid reimbursement is in the millions of dollars annually.

116.    According to the Office of the Controller, for fiscal year 2015, UCSF Medical Center as a whole had the following revenues from Medicare and Medi-Cal:

> "Total Medical Center revenues increased $299 million, or 13 percent, to $2.7 billion in 2015. The increase was primarily due to improved inpatient and outpatient volumes, an increase in the complexity of cases, and a slight change in the mix of payors to those with better contracted rates. The table below summarizes the revenue sources of the Medical Center:"

117.    In 2015, according to the Office of the Controller, Medicare billings comprised 18.3% of the Medical Center's revenue, and Medi-Cal comprised 7.7% of total billings. As a result, over

25

one-fourth of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

118.     Based on the overbillings identified by UCSF internally, as set forth above, assuming that

discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the

Government from UCSF overbilling to Medicare is $39.44 million dollars in fiscal year 2015

alone.

119.     According to the Office of the Controller, for fiscal year 2013, UCSF Medical Center as a

whole had the following revenues from Medicare and Medi-Cal:

> "Total Medical Center revenues increased $189 million, or 10 percent, to $2.16
> billion in 2013. The increase was primarily due to improved inpatient and
> outpatient reimbursement rates, an increase in the complexity of cases, and a slight
> change in the mix of payors to those with better contracted rates. The table below
> summarizes the revenue sources of the Medical Center:"

120.     In 2013, according to the Office of the Controller, Medicare billings comprised 19.2% of

the Medical Center's revenue, and Medi-Cal comprised 7.5% of total billings. As a result, over

one-fourth of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

121.     Based on the overbillings identified by UCSF internally, as set forth above, assuming that

discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the

Government from UCSF overbilling to Medicare is $33.28 million dollars in fiscal year 2013

alone.

122.     According to the Office of the Controller, for fiscal year 2011, UCSF Medical Center as a

whole had the following revenues of approximately $367 million dollars ($367,000,000) from

Medicare and $216 million dollars ($216,000,000) from Medi-Cal. The Medical Center's total

revenue for fiscal year 2011 was approximately $1.923 billion dollars ($1,923,000,000).

123.     In 2011, according to the Office of the Controller, Medicare billings comprised 19.08%

of the Medical Center's revenue, and Medi-Cal comprised 11.2% of total billings. As a result,

about 30% of Medical Center revenue derived from Medicare and Medi-Cal reimbursements.

124.    Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $29.36 million dollars in fiscal year 2011 alone.

125.    Based on information and belief, for fiscal year 2010, UCSF's Office of the Controller reported revenues from Medicare and Medi-Cal as a combined amount rather than separate and distinct revenue items. Based on information and belief, prior to 2010, UCSF did not report the specific amounts of revenues received from Medicare or Medi-Cal at all. Accordingly, the following extrapolations are made to provide an estimate of the quantum of harm based on the ascertainable data.

126.    According to the Office of the Controller, for fiscal year 2010, UCSF Medical Center as a whole had revenues of approximately $559 million dollars ($559,000,000) from Medicare and Medi-Cal combined. The Medical Center's total revenue for fiscal year 2011 was approximately $1.784 billion dollars ($1,784,000,000).

127.    As a result, about 31 % of Medical Center revenue in 2011 derived from Medi care and Medi-Cal reimbursements.

128.    Between fiscal years 2011-15, Medicare billings accounted for an average of about 68.4% of the Medical Center's combined revenue derived from Medicare and Medi-Cal. Thus, by extrapolation, the Medical Center derived about $382.3 million dollars from Medicare billings in 2010. Based on the overbillings identified by UCSF internally, as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $30.58 million dollars in fiscal year 2010 alone.

129.    According to the Office of the Controller, the approximate total annual reported revenues

27

for UCSF Medical Center and related activities were as follows for fiscal years 2004-09: $1.82 billion (2009); $1.65 billion (2008); $1.54 billion (2007); $1.39 billion (2006); $1.26 billion (2005); and $1.19 billion (2004). Thus, between fiscal years 2004-09, UCSF received approximately $8.86 billion dollars in total revenue from the Medical Center and related activities.

130.    Between fiscal years 2011-15, Medicare billings accounted for an average of 18.95% of the Medical Center's total annual revenue. Thus, by extrapolation, from fiscal years 2004-09, Medicare billings accounted for about $1 .64 billion in revenues.

131.    Based on the overbillings identified by UCSF internally , as set forth above, assuming that discovery identifies a similar rate of overbilling of 8%, then the quantum of harm to the Government from UCSF overbilling to Medicare is $131.2 million dollars in fiscal years 2004-09 alone.

132.    Absent an Order from the Court enjoining the practices set forth above, the loss to the Government will continue in the future.

133.    As the Administrator Director, of Clinical Operations for the Neurology Department, Relator Diana Juan was a compliance professional whose role was to improve medical documentation in order to support improved billing.

134.    JUAN was terminated after her efforts at improving the billing system were stifled by the named Defendants.   Due to the culture of retaliation, UCSF has a pattern and practice of not self-reporting overpayments and incorrect payments.

135.    Each of the individual Defendants had a personal and professional interest in ensuring that the false claims identified herein did not come to light, which would demonstrate mismanagement, and each had an interest in making sure that the overbillings identified by JUAN in the Department of Neurology as School of Medicine/Medical Center systemic issues

were not repaid to CMS, as such repayments would negatively impact their performance evaluation and career progression.

136.    Although each individual Defendant may not have personally profited from the false claims and failure to repay overbillings, each individual Defendant benefited from the false claims and overbillings, as it increased the profitability of their respective departments and areas of responsibility.

137.    Each of the individual Defendants had a personal and professional interest in ensuring that the false claims identified herein did not come to light, and that the overbillings identified by JUAN in the Department of Neurology as School of Medicine/Medical Center systemic issues were not repaid to CMS, as such information would negatively impact their professional reputation and career progression.

138.    The individual Defendants acted in concert and knowingly submitted or, in reckless disregard of the truth, allowed to be submitted unlawful claims described above.

139.    These improperly billed claims were caused by (1) inadequate documentation to support patient claims, (2) antiquated computer systems that generated false claims, (3) internal processes designed to improperly assign patient admission status, and (4) a lack of review to ensure appropriate patient status assignments.

140.    JUAN  brought these problems to the attention of UCSF management personnel, the named Defendants, and none of them acted to correct and/or prevent the Medicare claims from being improperly labeled and billed.

141.    UCSF management, the named Defendants, encouraged, directed, and facilitated the continued fraudulent activity against Medicare

142.    All of the named Defendants had an economic incentive to protect the information from disclosure as their salaries, bonuses, job security, and professional reputations were reliant on Medicare misbillings, overbillings, and false certifications being concealed.

143.    Defendant SAM HAWGOOD,  knowingly permitted the continued presentation or caused to be presented false claims for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

144.    Defendant HAWGOOD, as Chancellor of UCSF, had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

145.    Defendant STEPHEN HAUSER,  knowingly permitted the continued presentation or caused to be presented claims for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

146.    Defendant HAUSER, as Head of the Department of Neurology, had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

147.   Defendant EILEEN KAHANER,  knowingly permitted the continued presentation or caused to be presented claims for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

148.   Defendant KAHANER had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

149.   Defendant GRETA SCHNETZLER,  knowingly permitted the continued presentation or caused to be presented  for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

150.   Defendant SCHNETZLER, as the head of Legal Affairs at UCSF, had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

151.   Defendant CLIFF SKINNER,  knowingly permitted the continued presentation or caused to be presented for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act

together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

152.    Defendant SKINNER,  had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

153.    Defendant TERESA O'LONERGAN,  knowingly permitted the continued presentation or caused to be presented for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

154.    Defendant O'LONERGAN, as head of the Office of Compliance and Ethics, reported directly to the Chancellor.

155.    Defendant O'LONERGAN, upon information and belief,  had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

156.    Defendant SHERYL VACCA, knowingly permitted the continued presentation or caused to be presented for payment from the United States government; knowingly made, or caused to be made, false records or statements in order to receive payment from the Government and  act together to conspire with the other named Defendants to have the government pay a false or fraudulent claim.

32

157.    Defendant VACCA, had direct knowledge of the failure to audit the outside coding, the failure to repay overbillings caused by the systematic failures identified by JUAN in the Neurology Department, which were present throughout all parts of the School of Medicine and Medical Center because of systemic failure, and failed to cause UCSF to repay the overbilled items.

## NONMONETARY HARM

158.    The practices set forth above also carry with them non-economic harm: by not transmitting findings and the results of the referral back to the referring physician, very important medical care is not being rendered, and when it is being rendered, it is being slowed in a fashion that places the health and safety of referred patients at increased risk.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, through Plaintiff-Relator, requests the Court enter the following relief:

1.    That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729, *et seq*.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of 31 U.S.C. § 3729;

3.    That Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

4.    That Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Plaintiff-Relator recover such other relief as the Court deems just and proper.

33

1

2

3      Dated: July 9, 2018                            SMITH PATTEN

4                                                     _/s/ Dow W. Patten_
                                                      DOW W. PATTEN
5                                                     Attorney for Plaintiff-Relator
                                                      DIANA JUAN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Complaint                              Case No. : 16-cv-4034-CW